UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No. 23-20364-CR-RUIZ

UNITED STATES OF AMERICA,

vs.

ORLANDO ALFONSO CONTRERAS SAAB,

Defendant.

_____/

## MOTION FOR COMPASSIONATE RELEASE

Orlando Alfonso Contreras Saab, through undersigned counsel and pursuant to 18 U.S.C. § 3582(c)(1)(A), moves the Court for a compassionate release, and requests that his six-month sentence of incarceration be converted to a term of house arrest. Numerous attempts to contact the Bureau of Prisons "(BOP)" regarding this request have gone unanswered. In support he states:

### Background

1. On February 16, 2024, this Court sentenced Mr. Contreras Saab to a term of imprisonment of six months, followed by three years of supervised release. [ECF No. 48, 50]. Mr. Contreras is currently scheduled to surrender to FCI Oakdale II on February 10, 2025.

2. After Mr. Contreras was sentenced, Dr. Carlos A. Sesin, M.D., a rheumatic disease specialist, diagnosed him with ankylosing spondylitis. Ankylosing spondylitis is a chronic inflammatory disease that primarily affects the spine, causing pain, stiffness, and

eventual fusion of the vertebrae.  The ankylosing spondylitis has caused the fusion and inflammation of Mr. Contreras' sacroiliac joints, leading to significant discomfort and impairment of his mobility.  If not treated, the condition could lead to permanent disabilities.

3.      Dr. Sesin is currently treating Mr. Contreras.  Dr. Sesin will be present and prepared to testify, if necessary, at this Court's February 3, 2025, hearing.

4.      Ankylosing spondylitis can also affect other joints, ligaments, and even organs such as the eyes.  As a result of the ankylosing spondylitis, Mr. Contreras has also contracted uveitis (inflammation of the uvea or the middle layer of the eye) and risks suffering permanent loss of sight if he is not fully and properly treated on an ongoing basis. Untreated uveitis can result in vision impairment or blindness, impacting not only Mr. Contreras' ability to perform daily activities but also his overall well-being and independence.

## Treatment

5.      Proper treatment of Mr. Contreras' medical condition requires a multidisciplinary approach involving rheumatologists, ophthalmologists, physical therapists, and other specialists.  The goal of Mr. Contreras' treatment is to reduce inflammation, alleviate symptoms, and prevent disease progression.

6.      Mr. Contreras' treatment involves a combination of medications, such as nonsteroidal anti-inflammatory drugs, disease-modifying antirheumatic drugs, biologics, corticosteroid eye drops, and physical therapy.  These treatments are often modified over

2

time based on the decision-making and collaboration of the treating physicians, the progression of the disease, and the efficacy of treatment.

7.      Mr. Contreras has initiated treatment with biologic medications, which necessitates close monitoring.  This biologic medication must be constantly and carefully temperature controlled and administered at specific criteria without deviation. Dr. Sesin is closely monitoring Mr. Contreras as his body adjusts to these new medications and their side effects.  Biologic medications suppress the immune system and can increase Mr. Contreras' risk for infections and cancer.  Dr. Sesin is also collaborating with other specialists to determine the appropriate course of treatment on an ongoing basis and any adjustments to this treatment that will be necessary as his treatment continues.

8.      Direct, real-time monitoring of Mr. Contreras is crucial to assess the effectiveness of the treatment to make any necessary adjustments to ensure optimal disease control and management.  To maintain Mr. Contreras' quality of life and to mitigate the progression of his condition, it is essential that he continues to adhere to these recommendations.

9.      Mr. Contreras also requires specialized physical therapy to effectively treat his condition.  This consistent and regular specialized physical therapy must continue because it is an integral part of his treatment plan necessary to preserve and improve mobility, strength, and overall function.

10.      Inadequate treatment or non-adherence to these medical recommendations can have severe and permanent consequences for Mr. Contreras.  Untreated inflammation can lead to irreversible joint damage, spinal fusion, and disability.  Mr. Contreras suffers

3

from chronic pain and will continue to do so if he is not able to strictly comply with his treatment regimen. He also runs an immediate risk of rapid disease progression if he does not, or is unable to, adhere to these medical recommendations.

11.    In addition to Dr. Sesin, Mr. Contreras is also currently being treated for his condition by Dr. Mayelin La Fe Veloz (Primary Care), Dr. Nina Diklich (Ophthomology), Dr. Joseph Reimon (Cardiology), Dr. Jose Restrepo (Physical Medicine), and Marco Morelli CNMT-LMT (Neuromuscular Therapy). Since his treatment began, he has had dozens of appointments with these physicians and practitioners, and currently has at least one or more appointments with these physicians and practitioners each week. These appointments are necessary to properly treat Mr. Contreras to maintain or improve his condition and to seek to mitigate the imminent risk of rapid disease progression.

### Bureau of Prisons Cannot Properly Treat this Condition at this Time

12.    This Court should consider the medical complexities, multi-disciplinary treatment, and other challenges associated with Mr. Contreras' treatment given the debilitating nature of his medical conditions and the serious risk of rapid disease progression with potentially irreversible outcomes. If Mr. Contreras were to serve his term of imprisonment, he would very likely suffer long-term and irreversible debilitating effects to his health, mobility, sight, and overall quality of life, including lifetime chronic pain, because the BOP will not properly treat his medical conditions.

13.    Mr. Contreras' condition requires close supervision and ongoing medical care and support, and any disruptions to his treatment regimen will very likely have serious detrimental effects on his health and quality of life.

14.     The BOP cannot properly treat Mr. Contreras for several reasons.  First, rather than seamlessly continue Mr. Contreras' treatment, it will start the treatment over with an initial medical assessment.  The BOP medical department is not set up to coordinate with outside physicians.  This will eliminate any progress that has been made in the ongoing treatment and will cause a significant delay in the treatment.  His incarceration will require BOP to schedule a medical examination, which will then lead to the need to schedule an examination from a specialist.  This process will take months before a treatment plan is even begun.  Incarceration will lead to a significant break in time where Mr. Contreras does not receive medication.  And the specialist will start from scratch in terms of monitoring the effect of the medications and progress of the treatment.  The "monitoring" of the effects of the medication will not be even close to "real time."

15.     BOP medical treatment is also unreliable and not equipped to frequently administer temperature-controlled medication.   BOP would not have the ability to administer refrigerated medication on a regular basis.  Its procedure for administering medication is to give the inmate an allotted amount of medication in advance.   This assumes that it even administers the medications Mr. Contreras is currently receiving.  It is likely that some of the more expensive medicines being taken by Mr. Contreras are not available while in BOP custody.

16.     Likewise, the BOP does not have the resources to administer the type of physical therapy Mr. Contreras requires.

17.     Undersigned has experienced clients using medical facilities at BOP for over 25 years and has zero confidence in its ability to properly treat Mr. Contreras' conditions.

Undersigned recently represented an inmate suffering from thyroid cancer. It took a motion to the court and the involvement of a Magistrate Judge to even get BOP to respond to the client's request for medical treatment. Only after the involvement of the court was a medical exam with a specialist scheduled. BOP then scheduled an appointment with an endocrinologist *nine months later*, claiming that was the first available appointment. BOP also was unable to obtain the client's prior medical records because of minimal effort. Only upon urging from the Magistrate Judge did they obtain the records.

18.     BOP is currently underfunded and understaffed.[1]  And now, it is under a hiring freeze.[2]  At its best, BOP would not properly treat Mr. Contreras. It certainly cannot while understaffed.

### Prison Conditions/FCI-Oakdale II

19.     Further, as noted above, Mr. Contreras is currently prescribed biologic medications which suppress the immune system and can increase his risk for infections and cancer. This makes incarceration extremely dangerous for him. The COVID epidemic highlighted how dangerous prison is regarding infections.

20.     During the COVID pandemic, then Attorney General William Barr directed BOP to "prioritize the use of [BOP's] various statutory authorities to grant home confinement" for vulnerable inmates with underlying conditions because "home confinement might be more effective in protecting their health."[3]  The AG further stated

---

[1] https://www.cbsnews.com/news/federal-prison-staffing-sexual-abuse-problems-60-minutes/
[2] https://www.forbes.com/sites/walterpavlo/2025/01/23/sweeping-changes-for-the-bureau-of-prisons-under-trump-administration/
[3] Memorandum for Director of Bureau of Prisons from The Attorney General, 3/26/90, available at: www.politico.com/f/?id=00000171-1826-d4al-ad77-fda671420000.

that "[t]here are particular concerns in this institutional setting. We want to make sure that our institutions don't become Petri dishes and it spreads rapidly through a particular institution."[4]

21.     Mr. Contreras would be a vulnerable inmate. Prison inmates are not able to take precautions to avoid contracting infections.     To the contrary, conditions of confinement create the ideal environment for transmission of contagious diseases, and providing infection control in a correctional facility is close to impossible.[5] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[6] COVID-19 rapidly spread through the prison system.

22.     The Center Disease Control "(CDC)" has explained that inmates are at special risk of infection because they "live, work, eat, study, and recreate within congregate environments," their ability "to exercise disease prevention measures (e.g. frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations . . . ."[7]

23.     The conditions at FCI-Oakdale put Mr. Contreras at grave risk for not being properly treated, incurring a permanent disability, and/or contracting an infection, where

[4] https://www.cbsnews.com/news/attorney-general-william-barr-bureau-of-prisons-send-inmates-home-coronavirus-covid-19/
[5] Joseph A. Bick (2007), Infection Control in Jails and Prisons, *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.
[6] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) at https:/bit.ly/2TNcNZY.
[7] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (updated Mar. 23, 2020), at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#verbal-screening.

7

he will face an increased chance of serious illness with long-term consequences and even death.

24.    FCI-Oakdale is a massive facility that houses over 1,000 inmates[8] in an enclosed, closed-quarters setting with limited access to open areas, and limited ability to practice social distancing. Mr. Contreras would live in a dormitory setting, with many men sharing bunkbeds. The unit shares a common air-conditioning system. In other words, the air that the inmates, guards, and staff breathe, exhale, cough and sneeze in is recirculated through the living space of the buildings.

25.    Inmates touch the same showering areas, telephones, food trays, railings, and computers. The inmates wear no gloves, no masks, and have no hand sanitizer.[9] Mr. Contreras' dormitory would share toilets, showers, and sinks with the many other men he would be living with. The inmates are not provided with any cleaning supplies or disinfectants. The showers and bathrooms are only cleaned weekly. Inmates cough and sneeze and talk in close proximity to each other, and inevitably touch their mouths, noses, and faces. Yet, the railings, phones, computers, and other items are rarely, if ever, wiped down.

26.    FCI-Oakdale II is not a medical facility and has limited medical treatment abilities. Any complication that was not obvious and did not immediately appear as an emergency would not be reacted to quickly. Mr. Contreras would have to make a request to see a doctor, which would take potentially weeks before being honored. BOP would

---

[8] https://www.bop.gov/locations/institutions/oad/
[9] Blakinger & Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is Contraband?*, ABA Journal (3/13/20), www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

have to transport Mr. Contreras to a hospital if he were to suffer any complications. Indeed, even at the best of times, medical care is limited in federal prisons.[10]

## Compassionate Release Statute

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on a the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)   Extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Accordingly, to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), Mr. Contreras must both meet the exhaustion requirement and demonstrate that "extraordinary and compelling reasons" warrant a reduction of his sentence.

## Notice/Administrative Exhaustion

Mr. Contreras has made a request to BOP that his sentence be converted to home confinement. He sent the request to the Warden at FCI-Oakdale II. He also made the

---

[10] Maruschak, Laura, Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491 (2015). Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

request to a BOP legal liaison undersigned has dealt with regarding other client medical issues. At the time of filing, Mr. Contreras has not received a response from anyone.

Regardless, even if Mr. Contreras' request to BOP is not deemed exhausted the Court should excuse the exhaustion requirement in this matter. Indeed, waiting for the administrative request to be final could lead to irreversible implications. Courts have routinely found that the exhaustion of administrative remedies is unnecessary where the process may render the requested relief moot. *United States v. Wilson Perez*, 2020 WL 1546422 (S.D.N.Y. 2020); *United States v. Platten*, Case No. 08-80148 (DE 155)(S.D. Fla. Apr. 17, 2020)(Middlebrooks, J.); *United States v. Minor*, Case No. 18-80152 (DE 35)(S.D. Fla. Apr. 17, 2020)(Middlebrooks, J.).

"Even where exhaustion is seemingly mandated by statute . . . the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019)(citing *McCarthy v. Madigan*, 503 U.S. 140, 146-47 (1992)). The Supreme Court has stressed that for "a statutory exhaustion provision . . . Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." *Ross v. Blake*, 136 S.Ct. 1850, 1857 (2016). Even when faced with statutory exhaustion requirements, however, the Supreme Court has allowed claims to proceed notwithstanding a party's failure to complete the administrative review process established by the agency "where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate," so long as the party presented the claim to the agency. *Mathews v. Eldridge*, 424 U.S. 319, 330 (1976). That reasoning explains why even statutory exhaustion requirements are "not absolute." *Washington*, 925 F.3d at 118. Mr.

Contreras has presented his claim to the warden at FCI Oakdale II and noticed the February 3, 2025, hearing and therefore the BOP has received notice.

## **Extraordinary and Compelling Reasons for Release**

Mr. Contreras' high risk of suffering permanent disabilities and even losing his sight constitute "extraordinary and compelling reasons" allowing him to serve his short sentence on house arrest. 18 U.S.C. § 3582(c)(1)(A)(i). "Extraordinary and compelling reasons" are defined by the United States Sentencing Guidelines. U.S.S.G. § 1B1.13, comment n.1. U.S.S.G. § 1B1.13 comment n.1(D) authorizes release based on "an extraordinary and compelling reason other than, or in combination with, the [other] reasons described."

The combination of Mr. Contreras lack of criminal history outside of this case, his likelihood of becoming infected, and the inability for BOP to treat his ankylosing spondylitis and uveitis meet the definition of "extraordinary and compelling." Moreover, Mr. Contreras is not a danger to any other person or to the community as a non-violent individual. *See* U.S.S.G. 1B1.13(2).

The AUSA assigned to this matter defers to the Court regarding this request.

WHEREFORE, for good cause shown, the Defendant, Orlando Alfonso Contreras Saab, respectfully requests that this Court convert his six months of incarceration to house arrest.

Respectfully submitted,

JOHN W. WYLIE, P.A.
40 N.W. 3rd St., PH 1
Miami, Florida 33128
Telephone (305) 586-1338

By:
s/ John W. Wylie
John W. Wylie, Esq.
Florida Bar No. 0133817
jww@johnwylielaw.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of January, 2025, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

s/ John W. Wylie
John W. Wylie, Esq.